**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 1:25-cr-247 |
| Silas Christopher Foote, | ) | |
| | ) | |
| Defendant. | ) | |

---

Before the Court is the Defendant's motion to suppress filed on April 29, 2026. See Doc. No. 22. The Government filed a response in opposition to the motion on June 17, 2026. See Doc. No. 38. An evidentiary hearing was held on September 10, 2026. The Defendant filed a post-hearing brief on October 9, 2026, See Doc. No. 47. The Government filed a post-hearing brief on October 9, 2026. See Doc. No. 48. For the reasons set forth below, the motion is denied.

## I. BACKGROUND

Around 9:00 p.m. on July 19, 2025, officers with the Three Affiliated Tribes Police Department (TATPD) responded to Teddy's Residential Suites ("Hotel") in New Town, North Dakota, for a 911 report of drug activity in a hotel room. The call was made by A.P., a 13-year-old female. After clearing the drug call, officers learned A.P. also wanted to report a sexual assault. A.P. told the officers she was assaulted the previous night by a man she referred to as "Uncle Silas." A.P. said she was out with friends when "Uncle Silas" gave her alcohol, she got intoxicated, and then "Uncle Silas" penetrated her vagina with his penis causing her pain.

TATPD Sergeant Shannon Duisen sought to identify "Uncle Silas." A.P.'s mother, Anastasia Seewalker, did not know who this could be. A.P.'s legal guardian is her aunt, Angeline Seewalker. A.P. has a relative named Silas Rush. Sgt. Duisen asked another TATPD officer, Joshua St. Pierre, to find a photograph of Silas Rush. Officer St. Pierre found a photograph of Silas Rush in the police database and gave it to Sgt. Duisen to show to A.P. A.P. indicated that was not her assailant. Officer St. Pierre then searched the database for anyone with the first name "Silas," and the search returned only one additional result—Silas Foote. Officer St. Pierre gave Sgt. Duisen a photograph of Foote to show A.P. A.P. identified Silas Foote as her assailant. Sgt. Duisen asked A.P. if Foote was introduced to her as her uncle, and she agreed. AP was transported for a SANE exam.

On July 18, 2025, A.P. went to stay with her mother, Anastasia, at the Hotel where her mother works and lives. Sometime after 10:00 p.m. that evening, Mason Foote and Silas Foote picked A.P. up from the hotel. Mason was driving. Mason and Silas had alcohol with them, which they gave to A.P. A.P. sat in the backseat of the car, with Silas in the front passenger seat. The trio drove to a lake outside of New Town. They continued to drink, and eventually Mason got out of the car and passed out. Silas then got in the backseat with A.P. and began making physical advances on her. Both A.P. and Silas were intoxicated. Silas touched A.P. on her breasts and what she described as "down there," referring to her genitals. A.P. tried to get Silas to stop, but he would not, and at one point Silas held A.P. by the neck. A.P. admitted to the forensic interviewer that she could not remember everything due to intoxication. A.P. stated that Silas had vaginal intercourse with her. A.P. could not remember whether Silas wore a condom or what made him stop, as she passed out during or after intercourse. When she awoke the next

morning, A.P. said she felt pain in her abdomen. She also felt pain in her genitals, which felt like "a bunch of cuts." A.P. was bleeding from her vagina, and not due to menstruation. A.P. had bruises and marks on her body, including on her neck. A.P. was with Silas and Mason until about 11:00 a.m. the next morning when Mason drove the trio back to New Town.

On July 24, 2025, A.P. sat for a forensic interview with a child and adolescent forensic interviewer and recounted the details of the assault. See Doc. No. 26-5. At the forensic interview, A.P. detailed the first time she met Silas Foote. A.P. said that about two months prior to the assault, A.P., and her brother Brendon went to Mason and Silas's house to drink and hang out. While at the house, Silas hugged A.P. and tried to kiss her and touch her body, which A.P. resisted. Eventually, A.P.'s brother Brendon intervened and pushed Silas away. In an interview with the FBI, Brendon confirmed this story. See Doc. No. 36-2. A.P. also said she believes that Silas is Mason's uncle and that is why she knows him as "Uncle Silas."

On August 22, 2025, FBI Special Agent Reed Mesman spoke with Anastasia See Walker. See Doc. No. 26-3. Anastasia told FBI Special Agent Mesman that when A.P. arrived back at the hotel at around 11:00 a.m. the morning of the assault, she noticed hickeys on A.P.'s neck and questioned A.P. where she had been all night. A.P. would not say, so Anastasia went outside the hotel to see who had dropped A.P. off. Anastasia saw the man who dropped off A.P. in his car, and she was close enough to see he also had hickeys on his neck. Anastasia confronted the man and asked if he knew A.P. was only 13 years old. FBI Special Agent Mesman asked Anastasia if she knew Silas Foote, and Anastasia said no. FBI Special Agent Mesman showed Anastasia a photograph of Silas Foote, and Anastasia said the person in the photograph was the man in the car. Anastasia reiterated that she did not know Silas Foote.

By early September 2025, the FBI still had not spoken with Silas Foote. FBI Special Agent Claire Gibby went to various locations connected with Silas to attempt to contact him. See Doc. No. 40-2. FBI Special Agent Gibby was unsuccessful, so she left her business card at some of the locations with her cell phone number hand-written on the card. The business cards did not contain any other information or instructions. FBI Special Agent Gibby also contacted Foote's supervisor at his place of employment.

On September 16, 2025, at around noon, Silas Foote and his mother, Chastity Driver, showed up unannounced to the Minot, North Dakota FBI office. They were greeted by FBI Special Agent Sarah Joyce. FBI Special Agent Gibby was not in the office. FBI Special Agent Joyce took their contact information, and they left. FBI Special Agent Joyce then called FBI Special Agent Gibby to let her know Silas Foote had shown up unannounced. At around 12:40 p.m., FBI Special Agent Gibby sent the following text message to Silas: "Hi Silas, this is Special Agent Claire Gibby with FBI Minot. I will be back in our offices between 2:30 and 2:45, will you still be in Minot then to chat with me?" Shortly thereafter, FBI Special Agent Gibby made contact with Driver and informed her she would be back at the FBI office between 2:30 and 2:45 p.m. At around 2:30 p.m., FBI Special Agent Gibby received confirmation from Driver that they would return to the Minot FBI Office. At 2:43 p.m., FBI Special Agent Gibby received word from FBI Special Agent Joyce that Silas Foote and Driver had returned.

FBI Special Agent Gibby met Foote and Driver in the lobby of the Minot FBI Office. Foote was 20 years of age at the time of the interview, having been born in December of 2004. The agents invited Foote into the conference room directly adjacent to the lobby. Driver stayed in the lobby. Foote sat near the door of the conference room, and FBI Special Agent Joyce

closed the door. The door was not locked. The conference room was approximately 8 ft x 8 ft square. Foote was not restrained or told where to sit. The agents then began to interview Foote. An audio recording was made but the interview was not videotaped. See Doc. No. 36-6. Foote was not read his *Miranda* rights.

FBI Special Agent Gibby began the interview by asking Foote if he knew why agents wanted to talk to him. He said "no." Foote said he only knew agents were looking for him because his mother found one of FBI Special Agent Gibby's business cards. FBI Special Agent Gibby said the agents were investigating allegations involving Silas and a minor named A.P. Silas denied knowing A.P. Silas also denied A.P. had ever been to his home, that he knew her brother Brendon, and that he and Mason Foote lived together. FBI Special Agent Gibby clarified that the agents were investigating a July 2025 incident at a lake involving Silas, Mason, and A.P. Silas said the incident "doesn't ring a bell." Silas said he has never been around a minor or given a minor alcohol. FBI Special Agent Gibby then turned the interview over to FBI Special Agent Joyce for further questioning.

FBI Special Agent Joyce reminded Silas that he chose to come in that day to speak with them, which looked good for him. She told Silas that the agents did not know what happened, but that reports indicated he was involved, so they needed to investigate. She told Silas that he needed to tell the truth. FBI Special Agent Joyce told Silas that, although there might be consequences down the road, no matter what he said that day, he would not be arrested. FBI Special Agent Joyce reminded Silas that lying to federal agents could get him into more trouble, regardless of whether he committed the conduct they were investigating. FBI Special Agent

Joyce told Silas that agents could likely disprove his continued denials that he knew A.P. FBI Special Agent Joyce asked Silas to have an honest conversation.

FBI Special Agent Gibby then restarted the interview. Silas immediately admitted to knowing A.P. and her brother. Silas said he only hung out with A.P. one time previously at his house. Silas initially said no one was drinking there, but later admitted people were drinking. Silas said he did not try to hug or kiss A.P., but then later indicated some recollection of that happening. After these two contradictions, FBI Special Agent Joyce again reminded Silas he was speaking with federal agents and needed to tell the truth. Silas then recounted the events of that evening.

FBI Special Agent Gibby then shifted her focus to the incident under investigation. Silas denied going to the lake with A.P. and Mason. Silas denied being in a car with A.P. and again said he had only been with A.P. once. When asked if Mason would confirm his story, Silas said, "probably not." FBI Special Agent Joyce then told Silas there was a report of more happening by the lake, and she asked him what he remembered. Silas then said he remembered hugging, so FBI Special Agent Joyce asked Silas to tell his side of the story. Silas then told agents that he, Mason, and A.P. went to the lake, Mason jumped in for 20 minutes while Silas and A.P. sat in the car, then everyone went home. As to when he hugged A.P., Silas said he couldn't remember or forgot.

FBI Special Agent Joyce then asked Silas directly what happened in the 20 minutes while he and A.P. were in the car. Silas said they sat there "bored," and that he was drinking, but A.P. was not. Silas said A.P. was in the backseat and he stayed in the front. Silas denied he got in the backseat with A.P. FBI Special Agent Joyce then asked, "if that's what happened, then why are

we here today?" FBI Special Agent Joyce told Silas that at the very least, something made A.P. feel uncomfortable, and she asked Silas again to tell her what happened. Silas then admitted he was in the backseat with A.P. Silas said A.P. was okay with this, and they just sat together. Silas said he did not want to do anything in the backseat with A.P. After hearing this, FBI Special Agent Joyce said, "come on, man," to which Silas said, "okay, I did have sex with her."

Silas then recounted having sex with A.P. Silas said the sex was consensual, but he acknowledged A.P. was very drunk. Silas said he and A.P. kissed and A.P. did not say anything during sex. Silas described what clothing he and A.P. were wearing. Silas confirmed he had vaginal sex with A.P. and that he wore a condom.

FBI Special Agent Joyce asked for more clarification. Silas said he hadn't spoken with A.P. since the incident and reiterated he had only met A.P. once prior. FBI Special Agent Joyce asked how intoxicated A.P. was, and Silas said she was "black out drunk." Silas described how he and A.P. were positioned during sex. When asked about A.P.'s responses during sex, Silas said A.P. did not attempt to stop the sex. When asked how old he thought A.P. was, Silas said fourteen. When asked how old he thought A.P. was during this incident, Silas said thirteen. Silas said he didn't know why he had sex with A.P., but blamed his drinking. Silas then consented to a DNA swab, and questioning regarding the incident concluded. Silas was not arrested and left the FBI office with his mother.

## II. **LEGAL DISCUSSION**

The Defendant contends law enforcement officers failed to read him his *Miranda* rights prior to questioning him. The Defendant also contends the photo identification procedures used in this case were unduly suggestive. The Government maintains the Defendant was not in custody when he was questioned. The Government also maintains the photo identification procedures used were reliable and there was little risk of misidentification.

**A. MIRANDA**

The Defendant contends the FBI interview he participated in on September 16, 2025, was custodial in nature and was conducted without the benefit of *Miranda* warnings. He asks that the statements made during the interview be suppressed. The Government contends the interview was not custodial in nature, and thus no *Miranda* warnings were required.

It is well-established that law enforcement officers must administer *Miranda* warnings whenever a suspect is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." Miranda v. Arizona, 384 U.S. 436, 478-79 (1966). The basic rule of *Miranda* is that an individual must be advised of the right to be free from compulsory self-incrimination and the right to the assistance of an attorney when an individual is taken into custody for questioning. United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990). Accordingly, *Miranda* requires that law enforcement officers advise an individual as to the availability of this privilege against self-incrimination and to the assistance of counsel when the individual is interrogated while in custody. Id.

For purposes of *Miranda*, an individual is in custody when he is either formally arrested or his freedom of movement is constrained to a degree equivalent with formal arrest. United

States v. Brave Heart, 397 F.3d 1035, 1038 (8th Cir. 2005). The *Miranda* custody test is objective and requires two discrete inquiries: (1) what were the circumstances surrounding the interrogation, and (2) given those circumstances, whether a reasonable person would have felt free to terminate the interrogation and leave. Yarborough v. Alvarado, 541 U.S. 652, 663 (2004) (citing Thompson v. Keohane, 516 U.S. 99, 112 (1995)). In Berkemer v. McCarty, the United States Supreme Court affirmed that an objective test is preferable to a subjective test because under the objective analysis the police do not have the burden of anticipating the frailties or idiosyncrasies of every person whom they question. 468 U.S. 420, 442 (1984).

As outlined by the Eighth Circuit Court of Appeals in *Griffin*, the totality of circumstances must be analyzed, and the following six factors should be considered in determining whether an individual was in custody:

> (1) whether the suspect was informed during the interview that the questioning was voluntary, that he could ask the officers to leave, or that he was not considered under arrest;
>
> (2) whether the suspect possessed unrestrained freedom of movement during questioning;
>
> (3) whether the suspect voluntarily acquiesced to official questioning or initiated contact with authorities;
>
> (4) whether strong arm tactics or deceptive stratagems were employed during questioning;
>
> (5) whether there was a police-dominated atmosphere; and
>
> (6) whether the suspect was placed under arrest at the termination of the questioning.

922 F.2d at 1349; United States v. Rainbow, 380 F. Supp. 2d 1071, 1075 (D.N.D. 2005). "The first three indicia are mitigating factors which, if present, mitigate against the existence of

custody at the time of questioning. Conversely, the last three indicia are aggravating factors which if present, aggravate the existence of custody . . . these six indicia of custody are representative and are not exclusive." United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002).

The Eighth Circuit does not require the *Griffin* test be followed ritualistically in every *Miranda* case. United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004). "When the factors are invoked, it is important to recall that they are not by any means exclusive, and that 'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." Id. The most obvious way to demonstrate a person is not in custody is to tell him he is not in custody and he may terminate the questioning at any time. Id. at 826; Brave Heart, 397 F.3d at 1039.

As for the mitigating factors, the record reveals Foote voluntarily appeared at the FBI office for an interview. He effectively chose the date, time, and location for the interview by showing up unannounced and unscheduled. Foote was a 20-year old adult at the time of the interview and thus fully capable of making his own decisions as to whether to submit to an interview. Fooote was not told where to sit. The door to the interview room was not locked. He was unrestrained during the interview and not arrested at its conclusion. He was told during the interview that he would not be arrested that day. However, he was not told the interview was voluntary and that he was free to leave at any time. The interview lasted less than an hour. The mitigating factors favor a finding that Foote was not in custody despite the failure of the FBI to tell him that the questioning was voluntary and he could leave at any time. This is because Foote possessed unrestrained freedom of movement during the interview and because he voluntarily

showed up at the FBI offices for an interview and acquiesced to their questioning. Foote initiated the interview by voluntarily showing up at the FBI offices. Having voluntarily appeared and after being told he would not be arrested, Foote surely understood he was free to leave at any time and that the questioning was voluntary.

As for the aggravating factors, they also favor a finding that the interview was non-custodial. Foote controlled the time and place of the interview. The interview recording reveals the agents' questioning was professional, matter-of-fact, and did not involve any strong-arm tactics or deception. At the start of the interview, FBI Special Agent Gibby informed Foote what they intended to discuss. Foote clearly understood he was in an FBI office talking to two FBI special agents. The agents spoke with Foote in a calm, respectful, and professional manner, never raising their voices or using any derogatory or threatening language. The discussion went back and forth and cannot be described as police-dominated. The agents spoke one-at-a-time, and gave Foote adequate time to answer their questions. Foote was not arrested at the end of the interview and left the FBI offices with his mother.

Upon careful consideration of the *Griffin* factors and after listening to the interview, the Court concludes the Defendant was not in custody when he was interviewed by the FBI and thus no *Miranda* warnings were required.

### B. <u>PHOTO IDENTIFICATION</u>

In general, identification testimony from a person who has witnessed a crime is admissible, and it is for the jury to assess the credibility of the witness and the worthiness of the testimony. Sanchell v. Parratt, 530 F.2d 286, 292 (8th Cir. 1976). However, when police-arranged identification procedures raise doubts as to the reliability of the testimony, a defendant's due process rights are implicated. Perry v. New Hampshire, 565 U.S. 228, 237 (2012). "Limits on the admissibility of identification testimony which may have been influenced by governmental suggestion are mandated by the Sixth Amendment right to counsel clause and the due process clauses of the Fifth and Fourteenth Amendments." Sanchell, 530 F.2d at 292. It is the likelihood of misidentification which violates a defendant's due process rights. Neil v. Biggers, 409 U.S. 188, 198 (1972).

Courts employ a two-step analysis when a defendant challenges a police arranged out-of-court identification procedure. Perry, 565 U.S. at 238. First, the court must determine whether the procedure was impermissibly suggestive and, if so, whether it was so suggestive as to raise a very substantial likelihood of misidentification. Biggers, 409 U.S. at 198; United States v. Wilson, 787 F.2d 375, 385 (8th Cir. 1986). The Eighth Circuit Court of Appeals has recognized that use of single-photograph displays can be impermissibly suggestive. Sanchell, 530 F.2d at 294 (describing the showing of a single suspect to a witness as the most suggestive and most objectionable method of pretrial identification); United States v. Murdock, 928 F.2d 293, 297 (8th Cir. 1991) (noting a single photograph array is considered impermissibly suggestive); United States v. Patterson, 20 F.3d 801, 806 (8th Cir. 1994) (finding it improper to use single photograph displays with eyewitnesses); Ruff v. Wyrick, 709 F.2d 1219, 1220 (8th Cir. 1983); United States v. Smith, 21 F.4th 510, 518 (8th Cir. 2021). However, "[p]olice officers are not

limited to station house line-ups if there is an opportunity for a quick, on-the-scene identification. Thus, even if the line-up is inherently suggestive, the line-up will be admissible as long as it is not impermissibly suggestive and unreliable." United States v. Mitchell, 726 F. App'x 498, 501 (8th Cir. 2018); Sexton v. Beaudreaux, 585 U.S. 961, 965 (2018) ("To be impermissibly suggestive, the procedure must give rise to a very substantial likelihood of irreparable misidentification."); United States v. Heard, 951 F.3d 920, 925 (8th Cir. 2020).

Second, if the procedure was unnecessarily suggestive, the court must determine whether, under the totality of the circumstances, the identification was independently reliable. Manson v. Brathwaite, 432 U.S. 98, 114 (1977); United States v. Pickar, 616 F.3d 821, 827 (8th Cir. 2010). "Reliability is the linchpin" of the admissibility evaluation. Brathwaite, 432 U.S. at 114. The factors to be considered in evaluating a witness's ability to make a reliable and accurate identification include:

(1) the opportunity of the witness to view the accused at the time of the crime;

(2) the witness's degree of attention;

(3) the accuracy of his prior description of the accused;

(4) the level of certainty demonstrated at the identification; and

(5) the time between the crime and identification.

Pickar, 616 F.3d at 827 (citing Brathwaite, 432 U.S. at 114). Only when the indicators of a witness's ability to make a reliable identification are outweighed by the corrupting effect of an unduly suggestive law enforcement identification procedure should the evidence be suppressed. Perry, 565 U.S. at 239.

**1. A.P.**

In this case, the use of a single-photo display was not impermissibly suggestive because A.P.'s assailant was known to her and she had already provided law enforcement with his first name. A.P. knew Mason Foote and Silas Foote when she got in the car with them and then spent the next twelve hours with them. At the suppression hearing, A.P.'s brother, Brendon, testified that A.P. knew Silas Foote because two months prior to the assault he had introduced A.P. to Silas Foote at a house party where Silas Foote lived. Brendon provided this same account to the FBI on August 22, 2025, when they interviewed him. See Doc. No. 40-1. A.P. was not asked to identify an unknown suspect. Rather, she was asked to identify a person known to her from a prior interaction. Thus, Silas Foote was known to A.P., and there was very little chance of misidentification. This conclusion is bolstered by A.P. indicating to law enforcement that the first photo shown to her was not her assailant. Under these circumstances, the Court concludes the use of a single-photo display was not impermissibly suggestive and A.P.'s identification of Silas Foote was not unreliable. Suppression is unwarranted.

**2. ANASTASIA SEEWALKER**

Anastasia's identification is a closer call than that of A.P. because Anastasia did not know Silas Foote prior to the incident in question. A better procedure would have involved a showing of multiple photographs in order to make the identification less suggestive. However, the totality of the circumstances renders the identification independently reliable.

FBI Special agent Reed Mesman testified he showed Anastasia a single photo to see if Foote was the man Anastasia saw in the car the morning after the assault. This occurred

approximately one month after A.P.'s initial disclosure and after A.P. sat for a forensic interview, which FBI Special agent Mesman attended. By the time of Anastasia's identification, Foote was the sole suspect in the case. A.P. had repeatedly identified him as her assailant and Foote was known to A.P. prior to the assault. The purpose in showing the single photograph to Anastasia was not to identify the suspect, but rather to ascertain whether Foote was the man Anastasia saw in the car at the Hotel. On the morning of July 19, 2026, Anastasia confronted the man in the car who had the hickies on his neck about being out with her 13-year old daughter all night. She talked to the man and was close enough to see hickies on his neck. She got a good look at him but did not know him. A.P. wanted to go to the rodeo with the man but Anastasia would not let her. Thus, the man in the car was known to A.P. Anastasia's identification of him one month after the incident confirmed what was already known and suspected. Under these circumstances, the Court concludes the identification was independently reliable. Suppression of Anastasia's identification is not warranted.

## III. CONCLUSION

The Court has carefully reviewed the entire record, the parties' arguments, and the relevant case law. For the reasons set forth above, the motion to suppress (Doc. No. 22) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 26th day of October, 2026.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court